David R. Paoli
Paul M. Leisher
PAOLI LAW FIRM, P.C.
257 W. Front, Suite A
Missoula, MT 59801
Telephone: 406-542-3330
Facsimile: 406-542-3332
davidpaoli@paoli-law.com
paulleisher@paoli-law.com
*Attorneys for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA,
## MISSOULA DIVISION

| | |
|---|---|
| LENNY J. RUSTAD, | Civil No. _____ |
| Plaintiff, | |
| vs | |
| BANK OF AMERICA CORPORATION and BANK OF AMERICA, NA. | **COMPLAINT** |
| Defendants. | |

## PARTIES AND JURISDICTION

1.      Lenny Rustad is a resident of Anaconda, Deer Lodge County, Montana. The real property at issue herein is located in Anaconda, Montana.

2.      Defendant Bank of America Corporation ("Bank of America" or "BOA") is a multinational banking and financial services corporation, headquartered in North Carolina and incorporated in Delaware, operating as the largest bank holding company in the United States.  At all times material to this Complaint, Bank of

America was doing business in Montana.  Bank of America is the parent

corporation of Defendant Bank of America, NA.

3.      Bank of America, NA is a national banking association organized under the

National Bank Act.  Through a series of intervening subsidiaries, Bank of America,

N.A. is 100% owned by Bank of America Corporation.  Bank of America, NA is

the successor by merger to BAC Home Loans Servicing, LP (BAC), the loan

servicing part of Bank of America.  BAC was formerly known as Countrywide

Home Loans Servicing LP ("Countrywide").  Countrywide Home Loans, including

Countrywide Home Loans Servicing LP was acquired by Bank of America in July

2008.  Throughout this Complaint, Defendants Bank of America, NA, and Bank of

America Corporation are referred to collectively as "Bank of America."

4.      Jurisdiction is proper under 28 U.S.C. § 1332.

## FACTS

**Bank of America and HAMP**

5.      Congress passed the Emergency Economic Stabilization Act of 2008 on

October 3, 2008 and amended it with the American Recovery and Reinvestment

Act of 2009 on February 17, 2009 (together, the "Act"). 12 U.S.C.A. §5201 et. seq.

(2009).

6.      The purpose of the Act was to grant the Secretary of the Treasury the

authority to restore liquidity and stability to the financial system, and ensure that

such authority is used in a manner that "protects home values" and "preserves homeownership."12 U.S.C.A. §5201.

7.      The Act granted the Secretary of the Treasury the authority to establish the Troubled Asset Relief Program ("TARP"). 12 U.S.C. § 5211. Under TARP, the Secretary could purchase or make commitments to purchase troubled assets from financial institutions. *Id.*

8.      In exercising its authority to administer TARP, the Act mandated that the Secretary "shall" take into consideration the "need to help families keep their homes and to stabilize communities." 12 U.S.C. § 5213(3).

9.      The Act further mandated, with regard to any assets acquired by the Secretary that are backed by residential real estate, that the Secretary "shall implement a plan that seeks to maximize assistance for homeowners" and use the Secretary's authority over servicers to encourage them to take advantage of programs to "minimize foreclosures." 12 U.S.C. §5219.

10.     The Act grants authority to the Secretary of the Treasury to use credit enhancement and loan guarantees to "facilitate loan modifications to prevent avoidable foreclosures." *Id.*

11.     Bank of America accepted $15 billion in initial funds from the United States Government as part of TARP.  In January 2009, in connection with its acquisition of Merrill Lynch, Bank of America accepted another $10 billion in TARP funds

along with a partial guarantee against losses on $118 billion in mortgage-related assets.  By accepting this payment, Bank of America agreed that it would participate in one or more programs that TARP authorized the Secretary of the Treasury to establish necessary to minimize foreclosures.

12.     On February 18, 2009, pursuant to their authority under the Act, the Treasury Secretary and the Director of the Federal Housing Finance Agency announced the Making Home Affordable ("MHA") program.

13.     The Making Home Affordable program consists of two subprograms. The first sub-program relates to the creation of refinancing products for individuals with minimal or negative equity in their home, and is now known as the Home Affordable Refinance Program.

14.     The second sub-program relates to the creation and implementation of a uniform loan modification protocol, and became known as the Home Affordable Modification Program ("HAMP").  It is this subprogram that is at issue in this case.

15.     HAMP was funded by the federal government, primarily with TARP funds. The Treasury Department allocated at least $75 billion to HAMP, of which at least $50 billion is TARP money.

16.     Under HAMP, the federal government incentivized participating servicers to enter into agreements with struggling homeowners that would make adjustments to

the existing mortgage obligations in order to make the monthly payments more affordable.

17.    The industry entities that perform the actual interface with borrowers— including such tasks as payment processing, escrow maintenance, loss mitigation and foreclosure—are known as "servicers." Servicers typically act as the agents of the entities that hold mortgage loans. BAC Home Loans Servicing, LP is a servicing business operated by Bank of America, N.A. and its actions described herein were made as agents for the entities that hold mortgage loans.

18.    If a servicer either was required to or elected to participate in HAMP, they executed a Servicer Participation Agreement ("SPA") with the federal government.

19.    On April 19, 2009, Steve R. Bailey, Senior Vice President of Bank of America, N.A. executed an SPA, thereby making BAC a participating servicer in HAMP.

20.    The SPA executed by Mr. Bailey incorporated all "guidelines," "procedures," and "supplemental documentation, instructions, bulletins, frequently asked questions, letters, directives, or other communications" issued by the Treasury, Fannie Mae, or Freddie Mac in connection with the duties of Participating Servicers. These documents together are known as the "Program Documentation" (SPA 1.B.), and are incorporated by reference herein.

21.    The SPA mandates that a Participating Servicer "shall perform" the

activities described in the Program Documentation "for all mortgage loans it services." (SPA 1.A., 2.A.)7

22.     The Program Documentation requires Participating Servicers to evaluate all loans, which are 60 days or more delinquent for HAMP modifications. (SD 09-01 p. 4.) In addition, if a borrower contacts a Participating Servicer regarding a HAMP modification, the Participating Servicer must collect income and hardship information to determine if HAMP is appropriate for the borrower.

23.     A HAMP Modification consists of two stages. First, a Participating Servicer is required to gather information and, if appropriate, offer the homeowner a Trial Period Plan ("TPP").  The TPP consists of a three-month period in which the homeowner makes mortgage payments based on a formula that uses the initial financial information provided.

24.     BAC offers TPPs to eligible homeowners by way of a TPP Agreement, which describes the homeowner's duties and obligations under the plan and promises a permanent HAMP modification for those homeowners that fulfill the documentation and payment requirements.

25.     If the homeowner complies with all documentation requirements and makes all three TPP monthly payments, the second stage of the HAMP process is triggered, in which the homeowner is offered a permanent modification.

26.     BAC routinely refused to live up to its end of the TPP Agreement and offer

COMPLAINT AND JURY DEMAND                                                                6

permanent modifications to homeowners.  In February 2010, the U.S. Treasury reported that BAC's parent company had 1,066,025 HAMP-eligible loans in its portfolio. Trial periods had been started on only 237,766 of these loans.  Of those, just 12,761 resulted in permanent modifications (only 5% of the started Trial modifications and 1% of the eligible pool) even though many more homeowners had made the payments and submitted the documentation required by the TPP Agreement.

27.     By refusing to live up to the TPP Agreement and convert TPPs into permanent modifications, Bank of America put homeowners through significant stress and uncertainty by holding out the promise of a way to stay in their home at a mortgage payment they could afford.  Bank of America also prevented homeowners from pursuing other avenues of resolution, including using the money they put toward TPP payments to fund bankruptcy plans, relocation costs, or other means of curing their default.

**Bank of America's Initial Refusal to Comply with Its Obligations**

28.     Rustad owns a residence located at 820 Birch Street Anaconda, Butte-Silver Bow County, MT.

29.     Rustad secured a mortgage for the residence originated by Ascent Home Loans, Inc. on May 30, 2007.

30.     Countrywide serviced the mortgage until Countrywide was acquired by Bank of America.

31.     On September 14, 2009 Rustad received a letter from Bank of America introducing the HAMP loan modification program. The letter invited him to make the first of three trial period payments in the amount of $1,085.00 due on October 1, 2009.  Subsequent payments were due on November 1 and December 1 of 2009.

32.     On September 25, 2009, Bank of America sent a follow up letter again inviting Rustad to start the 3-month trial period loan modification process.

33.     On September 26, 2009 Lenny made the first trial period payment—for the month of October— through Western Union in the amount of $1,085.00.

34.     Rustad subsequently sent the required documentation to Bank of America to determine his eligibility for HAMP.

35.     Rustad made his subsequent two trial period payments for November and December 2009.

36.     On December 31, 2009, Bank of America sent Rustad a statement indicating that he was in a HAMP trial period plan.  The letter did not indicate that there were any deficiencies in the documents Rustad had provided Bank of America in order to determine eligibility for HAMP.

37.     Despite HAMP guidelines requiring only three trial period payments, in January 23, 2010 Lenny received a letter from Bank of America stating 3 trial

period payments had been received, but that Rustad must make a fourth in order to qualify for the HAMP modification. The letter informed him: "if you don't make payment within 30 days of the date of this letter you won't receive a Home Affordable Modification." The letter did not indicate that there were any deficiencies in the documents Rustad had provided Bank of America in order to determine eligibility for HAMP.

38.     Rustad's modification should have been made permanent, as required by HAMP, after he made his third payment.

39.     Rustad made a fourth payment and several thereafter, but Bank of America continued to refuse to acknowledge that he had completed the requirements to obtain a HAMP modification.

40.     Bank of America sent Rustad statements dated February 25 and March 30, 2010 indicating that he was still in a HAMP trial period plan, despite Rustad having completed his trial period payments in December 2009.

41.     Bank of America continued to increase Rustad's past due payment amounts, despite his payment of the amount due under the modification and despite the fact that his loan should have been permanently modified according to HAMP guidelines after he made his third and final trial period payment. The modification would have included capitalizing all past due amounts.

42.     On July 15, 2010, Bank of America sent Rustad a notice stating that Rustad

and Bank of America had "mutually agreed upon a Special Forbearance" and that

Rustad had failed to make his past due payments under the Forbearance, which

was therefore being terminated.  The letter failed to acknowledge that Rustad was

in a HAMP modification and had met all requirements necessary to make it

permanent as of January 2010 at the latest.

43.     At some point in 2010, Rustad attempted to make his modified payment.

Bank of America rejected the payment, telling Rustad that he wasn't in a

modification and had to pay his total past due amount of approximately

$16,000.00.

44.     On April 7, 2011 Bank of America sent Rustad a letter introducing the

National Homeownership Retention Program (NHRP), requesting he send a

number of documents.

45.     In letters dated May 5 and May 10, 2011, Bank of America acknowledged

receipt of Rustad's documents sent in application for an NHRP modification and

stated that the materials had been sent to "a specialist in the appropriate

department."

46.     On July 13, 2011 Bank of America sent a letter indicating Rustad was not

eligible for any modifications. The letter threatened: "if we do not hear from you

COMPLAINT AND JURY DEMAND                                                    10

by 7/27/11, the hold on the foreclosure will be released and foreclosure

proceedings will resume."

47.     On July 16, 2011, Bank of America sent a letter indicating that its previous

determination that Rustad was not eligible for HAMP was erroneous and invited

him to reapply.

48.     Rustad applied again, and was again told that he had not submitted the

requested documents.

49.     On October 31, 2011 Bank of America sent a letter to Rustad saying: "we

have not received your past due payments, so we have referred your home loan to

our Foreclosure Review Committee for review."

**Bank of America Is Sued for Its Refusal to Comply with Its Obligations**

50.     On March 12, 2012, the United States, the District of Columbia, and fort-

nine states[1] sued Bank of America and several other banks for a variety of

mortgage origination and servicing practices that violated state and federal law.

*United States, et al. v. Bank of America, et al.*, Cause No. 12-361 RMC, (D.D.C.

2012).

51.     The state and federal governments alleged, in part, that Bank of America's

"misconduct resulted in . . . premature and unauthorized foreclosures, violation of .

. . homeowners' rights and protections, the use of false and deceptive affidavits and

---

[1] Oklahoma was the only state that did not participate.

other documents, and the waste and abuse of taxpayer funds."

52.     In particular, the governments alleged:

The Banks' unfair and deceptive practices in the discharge of their loan servicing activities, include, but are not limited to, the following:
    a. failing to timely and accurately apply payments made by borrowers and failing to maintain accurate account statements;
    b. charging excessive or improper fees for default-related services;
    c. failing to properly oversee third party vendors involved in servicing activities on behalf of the Banks;
    d. imposing force-placed insurance without properly notifying the borrowers and when borrowers already had adequate coverage;
    e. providing borrowers false or misleading information in response to borrower complaints; and
    f. failing to maintain appropriate staffing, training, and quality control systems.
        . . .
Under the Treasury's various rescue and stimulus programs, [Bank of America] received monetary incentives from the Federal government in exchange for the commitment to make efforts to modify defaulting borrowers' single family residential mortgages. See, e.g., Making Home Affordable Handbook v.1.0, ch.13 ("Incentive Compensation") (Aug. 19, 2010). Under the programs, the Banks agreed to fulfill requirements set forth in program guidelines and servicer participation agreements.
. . .
In the course of their servicing and oversight of mortgage loans, the Banks violated federal laws, program requirements and contractual requirements governing loss mitigation.
In the course of their conduct, management and oversight of loan modifications in the plaintiff States, the Banks have engaged in a pattern of unfair and deceptive practices.
The Banks' failure to discharge their required loan modification obligations, and related unfair and deceptive practices, include, but are not limited to, the following:
    a. failing to perform proper loan modification underwriting;
    b. failing to gather or losing loan modification application

documentation and other paper work;

c. failing to provide adequate staffing to implement programs;

d. failing to adequately train staff responsible for loan modifications;

e. failing to establish adequate processes for loan modifications;

f. allowing borrowers to stay in trial modifications for excessive time periods;

g. wrongfully denying modification applications;

h. failing to respond to borrower inquiries;

i. providing false or misleading information to consumers while referring loans to foreclosure during the loan modification application process;

j. providing false or misleading information to consumers while initiating foreclosures where the borrower was in good faith actively pursuing a loss mitigation alternative offered by the Bank;

k. providing false or misleading information to consumers while scheduling and conducting foreclosure sales during the loan application process and during trial loan modification periods;

l. misrepresenting to borrowers that loss mitigation programs would provide relief from the initiation of foreclosure or further foreclosure efforts;

m. failing to provide accurate and timely information to borrowers who are in need of, and eligible for, loss mitigation services, including loan modifications;

n. falsely advising borrowers that they must be at least 60 days delinquent in loan payments to qualify for a loan modification;

o. miscalculating borrowers' eligibility for loan modification programs and improperly denying loan modification relief to eligible borrowers;

p. misleading borrowers by representing that loan modification applications will be handled promptly when [Bank of America] regularly failed to act on loan modifications in a timely manner;

q. failing to properly process borrowers' applications for loan modifications, including failing to account for documents submitted by borrowers and failing to respond to borrowers' reasonable requests for information and assistance;

r. failing to assign adequate staff resources with sufficient training to handle the demand from distressed borrowers; and

s. misleading borrowers by providing false or deceptive reasons

for denial of loan modifications.
Complaint, *U.S. v. Bank of America*, Document No. 1, ¶¶ 51–58, 1:12-cv-361

(D.D.C. 2012).

53.     On March 12, 2012, Bank of America entered into a settlement agreement

with the federal and state governments.  The court entered a Consent Judgment

April 4, 2012.  Consent Judgment, *U.S. v. Bank of America*, Document No. 11,

1:12-cv-361 (D.D.C. 2012).

54.     The Consent Judgment required Bank of America to offer HAMP

modifications to "borrowers enrolled in a trial period plan under prior HAMP

guidelines . . . and who made all required trial period payments, but were later

denied a permanent modification." *Id.* at Exhibit A-16.

55.     The Consent Judgment also required Bank of America to create a Settlement

Loan Modification Program ("SLMP").  *Id.* at Exhibit I-1.  Among the settlement

agreements between the banks and the state and federal governments, only Bank of

America was required to institute an SLMP.  The program had its own

qualifications for determining eligibility.  Borrowers who were eligible for both a

HAMP modification and an SLMP modification, could be referred to the SLMP in

lieu of evaluation under HAMP—but only if the borrower consented in writing.

*Id*. at I-2.

56.     Bank of America was also required to designate a Single Point of Contact

for each borrower to minimize confusing and conflicting messages and ensure

borrowers' mortgages were handled in accordance with the requirements of the Consent Judgment. *Id.* at A-21to 23.

**Bank of America's Continued Refusal to Comply with Its Obligations**

57.     On April 12, 2012, Rustad received a letter from his designated "Single Point of Contact," Bank of America employee Alexandra Krupski, indicating that she was his "designated customer relationship manager," and informing him that Bank of America had several mortgage assistance programs for which Rustad might be eligible.

58.     The letter from Ms. Krupski was the first and last written communication Rustad had with his "Single Point of Contact."

59.     On May 28, 2012, Bank of America informed Rustad by phone that he was eligible for something it termed the "Mortgage Settlement (NMS) program"— presumably the SLMP required of Bank of America by the Consent Judgment— but that Rustad would have to forego HAMP review to be eligible for it. According to Bank of America, Rustad agreed by phone to forego HAMP review in order to qualify for the NMS program.

60.     Assuming Bank of America's "NMS" program was indeed the SLMP required of Bank of America by the Consent Judgment, Bank of America was required to obtain consent in writing from a borrower before evaluating their

eligibility for that program in lieu of HAMP.  Bank of America never obtained consent in writing.

61.    On August 17, 2012 Bank of America sent a letter stating that Rustad might be eligible for a "new modification program introduced as a result of the U.S. Department of Justice and State Attorneys General global settlement with major mortgage servicers, including Bank of America, NA."  The "new medication program" was presumably the program uniquely required of Bank of America under the Consent Judgment, SLMP.  The letter acknowledged Rustad had begun the mortgage modification process by sending them information and requested a total of 21 documents in addition to what Rustad had already sent, some relevant to Rustad, others not relevant.

62.    Rustad provided all relevant documents in September 2012.

63.    On October 11, 2012 Bank of America sent Rustad a letter stating it had not received all the proper documentation and requested more documents.

64.    On October 18, 2012 Bank of America sent the same letter as on August 17, 2012, to Rustad's former attorney requesting many of the documents Rustad had already sent.

65.    On October 29, 2012, Rustad again sent the requested documents to Bank of America.

66.     On November 5, 2012 Bank of America sent Rustad a letter notifying him his loan modification was denied because "you did not provide us with the documents we requested."

67.     January 12, 2013 Bank of America sent Rustad a loan modification package announcing "We are pleased to let you know that you meet the criteria required to apply for a new modification program recently announced as a result of the U.S. Department of Justice and State Attorneys General national settlement with major mortgage servicers, including Bank of America, NA."  The package included the same forms to fill out and return that Rustad had previously filled out and returned to Bank of America.  In this letter Bank of America stated their "goal is successful home ownership."

68.     On February 13, 2013 Rustad faxed the completed documents from the enclosed package Bank of America sent January 12th.

69.     On June 8, 2013 Bank of America sent the last in a long series of letters denying him a modification, again saying Rustad did not submit all the documents requested.

70.     On June 27, 2013 Rustad's former attorney Stuart Whitehair filed an appeal of the decision with Bank of America.

71.     On July 6, 2013, Bank of America sent a letter stating that additional time would be needed to review the appeal of the modification denial.

72.   On July 10, 2013 the appeal was denied reiterating Rustad had not submitted all the requested documents.

73.   On November 20, 2013 Bank of America sent Rustad a letter notifying him his loan servicing will transfer to Specialized Loan Servicing ("SLS").

74.   On January 1, 2014, Bank of America transferred loan servicing to SLS.

75.   Rustad's residence was sold at foreclosure sale on December 29, 2015.

76.   Rusatad was eligible for, and met all the requirements for all of the modifications for which he applied.

77.   Rustad complied with all documentation requirements for each of the modifications for which he applied.

78.   Bank of America nonetheless denied each of his requests for the same feigned reason: insufficient documentation.

79.   Bank of America was aware that Rustad's mortgage, among others, was wrongly denied a modification in violation of the terms of the Consent Decree, but took no action to correct the wrongful denial.

80.   But for Bank of America's multiple wrongful denials of a modification, Rustad would have been able to afford his mortgage and would not have had his home foreclosed upon.

81.   As a result of Bank of America's wrongful denials and multiple misrepresentations about the adequacy of Rustad's documentation and eligibility

for a modification, Rustad wasted significant time, energy, effort, and money pursuing a modification Bank of America never intended to grant him.

82.   As a result of Bank of America's conduct, Rustad suffered significant emotional distress from the constant, false promise that Bank of America would place him in a modification if he met the requirements.

## COUNT I – CONSUMER PROTECTION ACT

83.    The preceding paragraphs are realleged as though set forth in full here.

84.   The Montana Consumer Protection Act ("the Act") prohibits unfair or deceptive acts or practice in any trade or commerce. Section 30-14-103, MCA.

85.   Throughout the course of its servicing of Rustad's mortgage, Bank of America engaged in an extended series of unfair and deceptive acts and patterns of practice, including unreasonable and unfair delays in processing his modification applications, conflicting and false statements about what Rustad must do to obtain a modification, and repeated false statements that Rustad had not submitted sufficient documentation to determine his eligibility for a modification.

86.   The Act further prohibits any business from stating that a transaction involves rights, remedies and duties it does not involve.

87.   Bank of America consistently and falsely stated that Rustad had a duty to provide documents and information that he was not required to provide, or had already provided.

88.     Bank of America refusal to abide by the terms of the Servicer Participation Agreement and the provisions of the HAMP Program Documentation violated public policy.

89.     Rustad suffered economic damages and significant stress, confusion, uncertainty, and fear as a result of Bank of America's wrongful conduct.

90.     Bank of America committed these acts with actual fraud or malice in that Bank of America disregarded facts that created a high probability of injury to Rustad and proceeded to act in conscious or intentional disregard or indifference to the high probability of injury to Rustad.

91.     Rustad is entitled to actual damages, treble damages, punitive damages, and attorneys fees.

## COUNT II – CONSUMER PROTECTION ACT

92.     The preceding paragraphs are realleged as though set forth in full here.

93.     Because Rustad made all of the required trial period payments under an original HAMP modification but was later denied the modification, Bank of America was required to offer him a HAMP modification under the terms of Consent Judgment.

94.     Bank of America had the option to evaluate Rustad for a modification under the SLMP in lieu of the HAMP modification, but was required to obtain Rustad's consent in writing prior to doing so.

95.     Bank of America evaluated Rustad for the SLMP in lieu of HAMP without obtaining his written consent to do so.

96.     Bank of America then requested documents beyond the documents it was required to accept as sufficient to establish eligibility for the SLMP under the terms of the Consent Judgment.

97.     Rustad submitted all the documents that were necessary and which Bank of America was required to accept as sufficient under the terms of the Consent Judgment.

98.     Bank of America nonetheless denied the modification for the feigned reason that he had not provided sufficient documents.

99.     Bank of America was required to designate a single employee as Rustad's point of contact regarding modification matters under the terms of the Consent Judgment.

100.    However, Rustad's "Single Point of Contact" within Bank of America was never the single point of contact with Bank of America.  In the period after the Consent Judgment was entered, Rustad spoke on the phone and exchanged letters and faxes with several Bank of America employees in his attempts to obtain a modification.

101.    Bank of America was required to adhere to strict timelines under the Consent Decree when informing Rustad of any insufficiencies in his

documentation and was required to give Rustad clear explanations of what documents or information were missing.  Bank of America refused to do either.

102.   Bank of America was required to adhere to strict timelines under the Consent Decree when making determinations of Rustad's elgibility for a modification and informing him of its determination.  Bank of America refused to do so.

103.   Bank of America refusal to abide by the terms of the Consent Judgment violated public policy.

104.   Bank of America committed these acts with actual fraud or malice in that Bank of America disregarded facts that created a high probability of injury to Rustad and proceeded to act in conscious or intentional disregard or indifference to the high probability of injury to Rustad.

## COUNT III – FRAUD

105.   The preceding paragraphs are realleged as though set forth in full here.

106.   Bank of America engaged in a consistent and extended practice of offering Rustad successive modifications which it had no intention of ever providing him.

107.   Bank of America consistently represented to Rustad that he would receive a modification if he only provided the requested documents and information.

108.   Bank of America also represented to Rustad that he was eligible for the SLMP and should apply for it, but had to orally waive his right to be considered under HAMP in order to be evaluated under the SLMP.

109.   Those representations were false.  Rustad provided the requested documents several times and Bank of America consistently and falsely claimed that he had not submitted the requested documents or the documents were incomplete.  Bank of America could not evaluate Rustad for the SLMP in lieu of HAMP without his written consent.  Moreover, Rustad was already eligible for HAMP because he had made the required trial period payments and later been denied.

110.   Bank of America's false representations were material.  It led Rustad to invest significant time, energy, effort, and funds into multiple attempts over several years to obtain a modification when those resources could have been invested in pursuing other avenues of financial relief.  The misrepresentation about the SLMP versus HAMP also led Rustad to miss out on the HAMP modification for which he was already eligible.

111.   Bank of America knew that its representations were false or was ignorant as to their truth.  No later than February 2010—when the U.S. Treasury reported that Bank of America was providing modifications to less than 1% of the people it was required to offer them to—Bank of America knew that it was routinely offering modifications and requesting that borrowers invest time, money, and effort into

modifications that it would never provide, despite being required to do so.  Bank of America also knew that Rustad was already eligible for a HAMP modification and that it could not evaluate him under the SLMP without Rustad's written consent.

112.   Bank of America intended that Rustad rely on its representations and submit documents and information destined to be lost or destroyed so that Bank of America could claim that it was complying with its obligations under the SPA, HAMP, and the Consent Judgment and could claim that the borrower was responsible for the modification denial by failing to provide adequate documentation.  It intended that Rustad rely on its misrepresentation regarding the SLMP in order to afford it another opportunity to deny Rustad a modification for the feigned reason that he had not submitted the required documentation and thereby evade its obligations under HAMP and the Consent Judgment.

113.   Rustad was ignorant of the falsity of Bank of America's representations and relied on them as evidenced by his repeated compliance with Bank of America's requests for documents.  Rustad would not have invested the time, effort, and money into the modifications had he not believed that Bank of America would provide him the modification upon his successful submission of the requested documents and information.

114.   Rustad had a right to rely on those representations.  Bank of America was required by the various provisions governing HAMP and Bank of America's SPA

to provide a modification to an eligible borrower, and Rustad was an eligible

borrower.  As the entity solely responsible for delivering federally mandated

modifications to mortgagees serviced by Bank of America, Rustad had a right to

rely on Bank of America's representations regarding the requirements of that

process and what would result in a successful modification.  Moreover, Rustad had

no reason to suspect that on of the largest mortgage servicers in the country would

engage in a consistent pattern of practice of fraudulent representations regarding

mortgage modifications governed by federal law.  Rustad, like most borrowers,

was not sophisticated in the details of mortgages, modifications, federal law in

general, or the specific provisions governing federally mandated mortgage

modifications.

115.   Rustad's reliance Bank of America's fraudulent representations caused him

injuries in the form of damage to his finances; the waste of time, money, and effort

in pursuit of modifications Bank of America would never grant him despite his

eligibility; and the associated stress, anxiety, and uncertainty.  Moreover, Rustad

lost out on all of the modification opportunities for which he was eligible as a

result of Bank of America's fraudulent representations.

116.   In the alternative, Bank of America committed constructive fraud in that it

engaged in conduct and representations that created a false impression that Rustad

was eligible for and would be given a modification so long as he complied with the document and information requests.

## COUNT IV – NEGLIGENT MISREPRESENTATION AND NEGLIGENCE

117.   The preceding paragraphs are re-alleged as though set forth in full here.

118.   Bank of America owed a duty to Rustad to exercise reasonable care or competence in obtaining information from and providing information to Rustad.

119.   Bank of America supplied false information to Rustad including, but not limited to:

a.     Statements and writings that if he provided requested documents he would be eligible for a modification;

b.     The statement that if Rustad completed three trial period payments he would be offered a modification agreement and his modification would become permanent;

c.     The statement that Rustad had to complete a fourth trial period payment to qualify for a permanent modification;

d.     The statements throughout early 2010, after more than four trial period payments, that Rustad was still in the trial period of a modification;

e.     The statement that Rustad was never in a modification;

f.     The statement that Rustad was not eligible for any modifications;

g.      Statements that a modification was denied for one reason when in fact it was denied for another; and

h.      The statement that Rustad would have a single point of contact at Bank of America to handle the modification process.

120.    Bank of America supplied this information to guide Rustad in his transactions with Bank of America.

121.    Rustad was unaware of the falsity of the representations, and justifiably relied on them.

122.    As a result, Rustad sustained damages.

123.    Bank of America had a duty to act with honesty, ordinary care and skill in its dealings with Rustad.  Those duties arise from common law duties and statutory duties as set forth at §§ 27-1-701, 28-1-201, 28-1-202, and 71-1-301 et seq., MCA. Those duties further arise because Bank of America's actions constitute a voluntary assumption of the same.

124.    Bank of America has acted negligently by breach of its duties and Rustad has been harmed by such actions of the Defendants.

125.    Bank of America committed these acts with actual fraud or malice in that Bank of America disregarded facts that created a high probability of injury to Rustad and proceeded to act in conscious or intentional disregard or indifference to the high probability of injury to Rustad.

## COUNT V – DECEIT PRIOR TO THE CONSENT JUDGMENT

126.   The previous paragraphs are realleged as though set forth in full here.

127.   As the above facts demonstrate, Bank of America deceived Rustad in numerous instances prior to being sued by the federal and state governments, including but not limited to: its misrepresentations about the modification process, how many trial period payments were required, what documents were required, and the adequacy of the documents Rustad submitted.

128.   Bank of America's actions constitute deceit, pursuant to 27-1-712 (1) and (2), MCA, and it is liable to Rustad for its violations of the statute.

## COUNT VI – DECEIT SUBSEQUENT TO THE CONSENT JUDGMENT

129.   The previous paragraphs are realleged as though set forth in full here.

130.   As the above facts demonstrate, Bank of America deceived Rustad in numerous instances after the Consent Judgment was entered, including but not limited to: its misrepresentations about the modification process, what documents were required, the adequacy of the documents Rustad submitted, and that Rustad could be evaluated for the SLMP in lieu of HAMP without obtaining written consent from Rustad.

131.   Bank of America's actions constitute deceit, pursuant to 27-1-712 (1) and (2), MCA, and it is liable to Rustad for its violations of the statute.

## COUNT VII – BREACH OF CONTRACT

132.   The previous paragraphs are realleged as through set forth in full here.

133.   Bank of America and Rustad were operating under two contracts, the deed of trust, and the modification agreement.

134.   Bank of America breached the deed of trust by misapplying payments, and by engaging in acts or practices that did not comply with its obligation of good faith and fair dealing.

135.   Bank of America breached the modification agreement by failing to bring Rustad's loan current upon Rustad complying with all the requirements of the modificaiton, and engaging in acts or practices that did not comply with its obligation of good faith and fair dealing.

136.   As a result of Bank of America's breaches, Rustad suffered damages.

## COUNT VIII – BREACH OF CONTRACT

137.   The previous paragraphs are realleged as through set forth in full here.

138.   Bank of America entered into a settlement agreement with the state and federal governments as embodied in the Consent Judgment.

139.   Borrowers like Rustad whose mortgages were serviced by Bank of America were the intended, third-party beneficiaries of that agreement.

140.   As alleged above, Bank of America breached its obligations under that agreement.

141.   As a result of those breaches, Rustad suffered damages.

## COUNT IX – NEGLIGENCE

142.   The previous paragraphs are realleged as though set forth in full here.

143.   As outlined above, Bank of America owed various duties to borrowers under the Consent Judgment.

144.   Rustad was a borrower, and Bank of America breached its duties to him under the Consent Judgment.

145.   Bank of America's breach of those duties caused damages to Rustad.

## COUNT X – EQUAL CREDIT OPPOURTUNITY ACT

146.   The preceding paragraphs are realleged as though set fourth in full here.

147.   Rustad was an applicant for credit as defined by the ECOA, 15 U.S.C. § 1691 a(b).

148.   At all relevant times herein, Bank of America has been "creditor" as defined by ECOA, 15 U.S.C. § 1691 a(e).

149.   15 U.S.C. § 1691 (d)(1) provides that "within thirty days.. after receipt of a completed application for credit, a creditor shall notify an applicant of its actions on the application."

150.   12 C.F.R. 202.((c) provides that "within 30 days after receiving an application that is incomplete regarding matters that an applicant can complete, the creditor shall notify the applicant either: (1) Of action taken, in accordance with paragraph (a) of this section; or (ii) of the incompleteness, in accordance with paragraph (c)(2) of this section."

151.   Rustad submitted multiple loan modification applications to Bank of America.

152.   Bank of America did not provide notice to Rustad within 30 calendar days as required by ECOA.

153.   Bank of America's refusal to provide notice to Rustad within 30 days constitutes a substantive violation of the ECOA.

154.   As result, Bank of America is liable to Rustad for actual damages, punitive damages up to $10,000 per violation, and attorney fees' and costs.


WHEREFORE, Plaintiff pray for judgment in his favor and:

1. For an award of all actual and statutory damages, including emotional distress, along with interest;

2. For an award of treble damages pursuant to § 30-14-133, MCA;

3. For an award of punitive damages in an amount to be specified at trial;

4. For an award of attorneys fees;

5. For an award of costs; and,

6. For such other and further relief as may be just and equitable.


## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38, Plaintiff hereby demands a trial by jury.


DATED this 8th day of June, 2016.


PAOLI LAW FIRM, P.C.


   /s/ Paul Leisher
Paul M. Leisher